GARMAN TURNER GORDON LLP
William M. Noall (SBN 122244)
wnoall@gtg.legal
Gregory E. Garman (*pro hac vice* admission to be filed)
ggarman@gtg.legal
Erika Pike Turner (*pro hac vice* admission to be filed)
eturner@gtg.legal
Dylan T. Ciciliano (*pro hac vice* admission to be filed)
dciciliano@gtg.legal
650 White Drive, Suite 100
Las Vegas, Nevada 89119
Telephone: (725) 777-3000
Facsimile: (725) 777-3112

*Attorneys for Plaintiff National Rifle Association*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** §<br>§<br>**Plaintiff,** §<br>§<br>**v.** §<br>§<br>**CITY AND COUNTY OF SAN FRANCISCO; VALLIE BROWN, both individually and in her official capacity; SANDRA LEE FEWER, both individually and in her official capacity; MATT HANEY, both individually and in his official capacity; RAFAEL MANDELMAN, both individually and in his official capacity; GORDON MAR, both individually and in his official capacity; AARON PESKIN, both individually and in his official capacity; HILLARY RONEN, both individually and in her official capacity; AHSHA SAFAI, both individually and in his official capacity; CATHERINE STEFANI, both individually and in her official capacity; SHAMANN WALTON, both individually and in his official capacity; and NORMAN YEE, both individually and in his official capacity,** §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 3:19-CV-5669<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF:**<br><br>**(1)  VIOLATION OF 42 U.S.C. § 1983 [FREEDOM OF SPEECH];**<br>**(2)  VIOLATION OF 42 U.S.C. § 1983 [FIRST AMENDMENT RETALIATION];**<br>**(3)  VIOLATION OF 42 U.S.C. § 1983 [FREEDOM OF ASSOCIATION].** |
| **Defendants.** § | |

## NATIONAL RIFLE ASSOCIATION OF AMERICA'S
## COMPLAINT AND JURY DEMAND

Plaintiff, the National Rifle Association of America (the "NRA") files this Complaint and Jury Demand ("Complaint") against Defendants City and County of San Francisco ("San Francisco") and San Francisco Supervisors Vallie Brown ("Brown"), both individually and in her official capacity; Sandra Lee Fewer ("Fewer"), both individually and in her official capacity; Matt Haney ("Haney"), both individually and in his official capacity; Rafael Mandelman ("Mandelman"), both individually and in his official capacity; Gordon Mar ("Mar"), both individually and in his official capacity; Aaron Peskin ("Peskin"), both individually and in his official capacity; Hillary Ronen ("Ronen"), both individually and in her official capacity; Ahsha Safai ("Safai"), both individually and in his official capacity; Catherine Stefani ("Stefani"), both individually and in her official capacity; Shamann Walton ("Walton"), both individually and in his official capacity; and Norman Yee ("Yee"), both individually and in his official capacity (collectively, "Defendants"), upon personal knowledge of its own actions, and upon information and belief as to all other matters, as follows:

## I.

## PRELIMINARY STATEMENT

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in . . . matters of opinion."[1] Put simply, the government cannot discriminate against citizens based on the viewpoint of their political speech. When this

---

[1] *W. Va. St. Bd. Of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

principle is followed, the United States is a beacon to lovers of freedom around the world[2]—to those who fear sham prosecutions, blacklisting, or worse at the hands of authoritarian regimes. When this principle is infringed, all Americans should rise to defend it.

On September 3, 2019, the San Francisco Board of Supervisors unanimously adopted a new government policy: blacklist anyone linked to the NRA. Specifically, Resolution No. 190841 (the "Resolution") calls for government officials to "assess the financial and contractual relationships our vendors and contractors have with [the NRA]," and to "take every reasonable step to limit those entities who do business with the City and County of San Francisco from doing business with [the NRA]."[3] The Resolution states outright that it targets the NRA's political speech, asserting that the NRA's "extremist positions" and objectionable pro-gun "advocacy" make it a "domestic terrorist organization."[4] Although obviously unconstitutional, the Resolution is far from original. New York Governor Andrew Cuomo, and city councilmembers in Los Angeles, made similar unlawful efforts to coerce businesses to cut ties with the NRA; similarly, New York Attorney General Letitia James campaigned on the falsehood that the NRA is a "terrorist organization."[5] Courts have sustained First Amendment claims in both Los Angeles and

---

[2] *See, e.g.*, Owen Franks, *Hong Kong Protesters Wave U.S. Flags, Urge Trump to Take Action*, BLOOMBERG (Aug. 31, 2019, 4:53 AM), https://www.bloomberg.com/news/articles/2019-08-31/hong-kong-protesters-wave-u-s-flags-urge-trump-to-take-action

[3] Resolution No. 190841 (September 3, 2019), reprinted at https://sfgov.legistar.com/View.ashx?M=F&ID=7568748&GUID=DF64490F-D8BC-4BF7-A43D-287F02BECCCA, at 3.

[4] Resolution at 2-3.

[5] Teddy Grant, *Letitia 'Tish' James on Becoming New York's Next Attorney General*, EBONY (Oct. 31, 2018), https://www.ebony.com/news/letitia-tish-james-on-becoming-new-yorks-next-attorney-general/

New York.[6] Regrettably, this Court, too, must step in to instruct elected officials that freedom of speech means you cannot silence or punish those with whom you disagree.

The NRA's nearly five million members include countless military veterans, first responders, and law enforcement officers who have risked everything to protect Americans from terrorism. Therefore, the Resolution's "terrorist" designation is a frivolous insult—but San Francisco's actions pose a nonfrivolous constitutional threat. In the face of recent, similar blacklisting schemes, financial institutions have expressed reluctance to provide bank accounts for disfavored political groups,[7] and city contractors fear losing their livelihoods if they support or even work with the NRA.[8] Where, as here, the government's conduct would "chill a person of ordinary firmness"[9] from continuing to engage in protected speech or association, the First Amendment mandates swift relief.

Unless vetoed by Mayor Breed, the Resolution will take imminent effect by operation of law.[10] The NRA cannot stand by and allow that to happen. Nor should this Court.

---

[6] *National Rifle Association v. City of Los Angeles,* Case No. 2:19-cv-03212-SVW-GJS (C.D. Cal.); *National Rifle Association of America v. Andrew Cuomo*, Case No. 1:18-cv-00566-TJM-CFH (N.D.N.Y.).

[7] Neil Haggerty, *Gun issue is a lose-lose for banks (whatever their stance)*, AMERICAN BANKER (Apr. 26, 2018, 1:11 PM), https://www.americanbanker.com/news/gun-issue-is-a-lose-lose-for-banks-whatever-their-stance

[8] *See* Complaint in *National Rifle Association v. City of Los Angeles,* Case No. 2:19-cv-03212-SVW-GJS (C.D. Cal. Apr. 24, 2019) (ECF No. 1), ¶¶ 6-7.

[9] *See, e.g., Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016).

[10] San Francisco Board of Supervisors Rules of Order 2.14-2.16, effective April 2, 2019 (Mayor has ten days to sign, not sign or veto legislation; if not signed, resolution takes effect after ten days).

## II.

## PARTIES

1.      Plaintiff NRA is a nonprofit corporation organized under the laws of the State of New York with its principal place of business in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment to the United States Constitution. The NRA has nearly five million members, and its programs reach millions more. The NRA was founded in 1871 in New York on the principle that individual rights are best safeguarded by the guarantee embedded in the Second Amendment, and the NRA today exercises protected First Amendment rights to advocate for continuation of the Second Amendment guarantees.

2.      Defendant San Francisco is a municipal corporation existing under the laws of the State of California, and is both a City and a County under the Constitution of the State of California with the capacity to sue and be sued. Its legislative body the Board of Supervisors unanimously passed the Resolution on September 3, 2019. Its principal place of business is San Francisco City Hall, 1 Dr. Carlton B. Goodlett Place, San Francisco, California 94102.

3.      Defendant Brown is a Supervisor, representing District 5 on the Board of Supervisors and, at all times relevant to the Complaint, was acting under color of state law. Her principal place of business is San Francisco City Hall, 1 Dr. Carlton B. Goodlett Place, Room 244, San Francisco, California 94102. Brown is sued in her individual and official capacities.

4.      Defendant Fewer is a Supervisor, representing District 1 on the Board of Supervisors and, at all times relevant to the Complaint, was acting under color of state law. Her principal place of business is San Francisco City Hall, 1 Dr. Carlton B. Goodlett Place, Room 244, San Francisco, California 94102. Fewer is sued in her individual and official capacities.

5.      Defendant Haney is a Supervisor, representing District 6 on the Board of Supervisors and, at all times relevant to the Complaint, was acting under color of state law. His principal place of business is San Francisco City Hall, 1 Dr. Carlton B. Goodlett Place, Room 244, San Francisco, California 94102. Haney is sued in his individual and official capacities.

6.      Defendant Mandelman is a Supervisor, representing District 8 on the Board of Supervisors and, at all times relevant to the Complaint, was acting under color of state law. His principal place of business is San Francisco City Hall, 1 Dr. Carlton B. Goodlett Place, Room 244, San Francisco, California 94102. Mandelman is sued in his individual and official capacities.

7.      Defendant Mar is a Supervisor, representing District 4 on the Board of Supervisors and, at all times relevant to the Complaint, was acting under color of state law. His principal place of business is San Francisco City Hall, 1 Dr. Carlton B. Goodlett Place, Room 244, San Francisco, California 94102. Mar is sued in his individual and official capacities.

8.      Defendant Peskin is a Supervisor, representing District 3 on the Board of Supervisors and, at all times relevant to the Complaint, was acting under color of state law. His principal place of business is San Francisco City Hall, 1 Dr. Carlton B. Goodlett Place, Room 244, San Francisco, California 94102. Peskin is sued in his individual and official capacities.

9.      Defendant Ronen is a Supervisor, representing District 9 on the Board of Supervisors and, at all times relevant to the Complaint, was acting under color of state law. Her principal place of business is San Francisco City Hall, 1 Dr. Carlton B. Goodlett Place, Room 244, San Francisco, California 94102. Ronen is sued in her individual and official capacities.

10.     Defendant Safai is a Supervisor, representing District 11 on the Board of Supervisors and, at all times relevant to the Complaint, was acting under color of state law. His

principal place of business is San Francisco City Hall, 1 Dr. Carlton B. Goodlett Place, Room 244, San Francisco, California 94102. Safai is sued in his individual and official capacities.

11.     Defendant Stefani is a Supervisor, representing District 2 on the Board of Supervisors and, at all times relevant to the Complaint, was acting under color of state law. Stefani introduced the Resolution on July 30, 2019. Her principal place of business is San Francisco City Hall, 1 Dr. Carlton B. Goodlett Place, Room 244, San Francisco, California 94102. Stefani is sued in her individual and official capacities.

12.     Defendant Walton is a Supervisor, representing District 10 on the Board of Supervisors and, at all times relevant to the Complaint, was acting under color of state law. His principal place of business is San Francisco City Hall, 1 Dr. Carlton B. Goodlett Place, Room 244, San Francisco, California 94102. Walton is sued in his individual and official capacities.

13.     Defendant Yee is a Supervisor, representing District 7 on the Board of Supervisors, serves as President of the Board of Supervisors, and, at all times relevant to the Complaint, was acting under color of state law. His principal place of business is San Francisco City Hall, 1 Dr. Carlton B. Goodlett Place, Room 244, San Francisco, California 94102. Yee is sued in his individual and official capacities.

### III.

### JURISDICTION AND VENUE

14.     Pursuant to 28 U.S.C. § 1331, the Court has subject matter jurisdiction over the claims asserted in this action because this action involves claims based on the First and Fourteenth Amendments to the United States Constitution (U.S. Const. amend. I, XIV) and 42 U.S.C. § 1983, and because the action seeks to prevent municipal officials from interfering with federal rights. Jurisdiction is also conferred on this Court by 28 U.S.C. § 1343(a)(3) because this action is brought to redress deprivations under color of state law of rights, privileges, and immunities secured by

the United States Constitution. This Court has authority to render declaratory judgments and to issue permanent injunctive relief under 28 U.S.C. §§ 2201 and 2202.

15.     Pursuant to 28 U.S.C. § 1391(b), venue is properly vested in this Court because the Defendants are located within the Northern District of California, and a substantial part of the events giving rise to the claim occurred in this judicial district.

16.     There is a present and actual controversy between the parties.

17.     The relief requested is authorized pursuant to 28 U.S.C. § 1343(a)(4) (recovery of damages or equitable relief or any other such relief for the protection of civil rights), 28 U.S.C. § 1651(a) (injunctive relief), 28 U.S.C. §§ 2201 and 2202 (declaratory and other appropriate relief), 42 U.S.C. § 1983 (deprivation of rights, privileges, and immunities secured by the Constitution), and 42 U.S.C. § 1988 (awards of attorneys' fees and costs).

**IV.**

**STATEMENT OF RELEVANT FACTS**

**A.     The NRA: History Of Dedicated Support For Gun Safety And A Commitment To Core Political Speech.**

18.     After the Civil War, two Union Army officers created a private association to promote marksmanship among the citizenry. The officers believed that the war would have ended significantly sooner if the northern troops had been able to shoot as well as the Confederate soldiers. They obtained a charter from the State of New York in November of 1871; thereafter, the National Rifle Association built a proud legacy in the State of New York and throughout the United States.

19.     The NRA has a rich history of providing instruction on firearm safety, as well as engaging in pro-Second Amendment advocacy that benefits not only the NRA's nearly five million members, but all United States residents. Every year, the NRA provides firearm safety training

programs, competitive shooting events, hunting programs, youth and women's programs, and informative membership updates. The NRA trains tens of thousands of certified gun safety instructors in all types of disciplines and works with many law enforcement organizations across the country. The NRA is a strong voice for those who choose to lawfully own, possess and use a firearm, and it diligently works to protect those rights guaranteed by the Second Amendment through advocacy protected by the First Amendment.

20.     First among the "Purposes and Objectives" contained in the NRA's bylaws is "[t]o protect and defend the Constitution of the United States." Accordingly, political speech is a major purpose of the NRA. The NRA engages in extensive legislative and educational advocacy to promote its purposes, as well as to vindicate the rights of its members and all Americans.

21.     The NRA spends tens of millions of dollars annually distributing pamphlets, fact sheets, articles, electronic materials, and other literature to advocate for its views on the Second Amendment and to assist NRA members engaging in national, state, and local firearm dialogue. The NRA's direct mail, television, radio, and digital communications seek to educate the public about issues bearing on the Second Amendment, defend the NRA and its members against political and media attacks, and galvanize participation in the political process by NRA members and supporters.

22.     To its critics, the NRA is best known as a "superlobby – one of the largest and most truly conservative lobbying organizations in the country," able to mobilize its millions of members in concerted efforts to protect the Second Amendment rights of all Americans.[11] Of course, the

---

[11] Christina Robb, *HANDGUNS AND THE AMERICAN PSYCHE THE ATTEMPTED ASSASSINATION OF A PRESIDENT BRINGS THE ISSUE INTO SHARP FOCUS ONCE AGAIN. HANDGUNS – WHAT DO THEY MEAN TO AMERICANS? TO THE NRA, THEY ARE A SYMBOL OF FREEDOM; TO THOSE FRIGHTENED OF CRIME, THEY REPRESENT SAFETY – EVEN*

NRA's letter-writing campaigns, peaceable public gatherings, and other grassroots "lobbying" activities constitute precisely the type of political speech which rests "[a]t the core of the First Amendment."[12]

**B.      The Resolution Unabashedly Targets the NRA's Political Speech, and Reflects An Undisguised Political Vendetta.**

23.      The Resolution was authored by Stefani, whose public presence centers around anti-Second Amendment advocacy.[13] Such advocacy is Stefani's constitutional right—but just as the Constitution entitles her to criticize and debate the NRA, it forbids her from wielding the powers of her office to suppress or retaliate against the NRA's exercise of its First Amendment rights.

24.      On July 30, 2019, Stefani introduced to the Board of Supervisors the Resolution, titled "Resolution declaring that the National Rifle Association is a domestic terrorist organization and urging other cities, states, and the federal government to do the same."

25.      The Resolution does not try to hide its animus toward the NRA's political speech, nor its animating purpose: to remove the NRA from the gun control debate. For example, the Resolution bemoans that the NRA "musters its considerable . . . organizational strength to promote gun ownership," cites "the National Rifle Association's influence" in enabling access to firearms,

---

*IF THE OWNER DOESN'T KNOW HOW TO USE THEM; TO GUN CONTROL ADVOCATES, THEY ARE SYMBOLS OF ULTIMATE EVIL*, BOSTON GLOBE, 1981 WLNR 68847 (June 7, 1981).

[12] *See Brown v. Hartlage*, 456 U.S. 45, 52 (1982).

[13] For example, Stefani's website describes her as "a City Hall veteran, gun violence prevention activist and former prosecutor," and notes that she serves as a "spokesperson" for multiple anti-gun advocacy groups whose raison d'être is to oppose the NRA. *See* https://sfbos.org/supervisor-stefani-district-2. Stefani appears to maintain an active Twitter feed, which rarely discusses the broader welfare of the City of San Francisco but contains copious invective against the NRA and gun owners *See* https://twitter.com/supstefani?lang=en&lang=en.

and singles out the NRA's "advocacy" as the direct cause of "arm[ing] those individuals who would and have committed acts of terrorism."

26.     The Resolution then "declare[s] the National Rifle Association a domestic terrorist organization." The Resolution also commits San Francisco's government to make a list of the vendors and contractors to the government who have relationships with the NRA, and further to deny business to those vendors and contractors unless they cease their relationships with the NRA.

27.     On September 3, 2019, Defendant Board of Supervisors unanimously approved the Resolution. During the proceedings that led to the vote, Stefani was quoted as saying "It is time to rid this country of the NRA."[14] In an interview after the vote, Stefani singled out the NRA as "the only organization that is really continuing to stand in the way of reform."[15] The dangers of "rid[ding] this country of" a disfavored political opponent are obvious.

28.     Pursuant to Rules 2.14-2.16 of the Rules of Order of the San Francisco Board of Supervisors, Mayor Breed has ten days to sign, not sign or veto the Resolution. Unless vetoed, the Resolution will take effect immediately upon approval by Mayor Breed, or at the latest, 10 days after it was delivered to her.

## C.     Despite Public Outcry, Defendants Stay the Course—Giving Rise to Reasonably Expected Chilling Effects.

29.     Third-party commentators immediately raised concerns about the First Amendment implications of Defendants' actions. For example, on September 5, 2019, just two days after the

---

[14] *See* Matt Bigler, *NRA Declared Terrorist Organization By SF Politicians*, KCBS RADIO (Sept. 4, 2019, 10:04 AM), https://kcbsradio.radio.com/blogs/matt-bigler/nra-declared-domestic-terror-organization-sf-politicians

[15] *See* Tim Dickinson, *We Talked to the Lawmaker Behind San Francisco's Branding of the NRA as a 'Terrorist Organization.' She's Not Backing Down*, ROLLING STONE (Sept. 5, 2019, 5:36 PM), https://www.rollingstone.com/politics/politics-news/lawmaker-san-francisco-nra-terrorist-organization-880727/

passage of the Resolution, newspapers that are routinely critical of the NRA published opinion pieces condemning the Resolution. The Washington Post ran a piece written by one of its columnists, Henry Olsen. Olsen exposed the weakness in the claim that the NRA was a terrorist organization: "The NRA . . . does not advocate, fund or support violence, nor does it try to create a 'climate of fear' to advance its policies. It does support an expansive view of gun rights, but that is not a terrorist act – unless political disagreement is now a criminal offense." Olsen understood the Resolution's inappropriate terrorist designation was directly tied to the NRA's advocacy involving "Constitutionally protected speech supporting the private ownership of guns." Lastly, Olsen recognized the McCarthyist elements of the Resolution: "It closes the noose around NRA members' necks by stating that the NRA 'promote[s] gun ownership and incite[s] gun owners to acts of violence. Congratulations, average NRA member: Your $30 one-year membership makes you a terrorist." [16]

30.     The senior editorial writer of the Los Angeles Times, Michael McGough, began his September 5, 2019 opinion piece by arguing the NRA "richly deserves criticism for its role in preventing the enactment of sensible gun-control legislation." But McGough had no difficulty denouncing the Resolution as "irresponsible for several reasons." Among them was the Resolution's intent "to blacklist contractors who deal with the NRA" that he astutely noted was "problematic from a 1st Amendment perspective."[17]

---

[16] *See* Henry Olsen, *No, San Francisco. The NRA is not a 'domestic terrorist organization.',* WASHINGTON POST (Sept. 5, 2019), https://www.washingtonpost.com/opinions/2019/09/05/no-san-francisco-nra-is-not-domestic-terrorist-organization/

[17] *See* Michael McGough, *The NRA is many things, but it's not a terrorist organization,* LOS ANGELES TIMES (Sept. 5, 2019, 3:58 PM), https://www.latimes.com/opinion/story/2019-09-05/nra-influence-san-francisco-terrorist-organization

31.     And Jonathan Turley, a public interest law professor at George Washington University, writing in the Hill on September 5, 2019, bluntly stated that the Resolution "sets the power of a government against a set of citizens solely on the basis of their politics. This is called 'viewpoint discrimination' in First Amendment law and is unconstitutional."[18]

32.     The NRA's fringe detractors, meanwhile, are gleeful about the Resolution, predicting that both the NRA and its individual supporters will "come under much closer scrutiny" by the San Francisco government in the Resolution's wake.  Citing the Resolution, one website proceeded to publish the names and home addresses of private persons who had donated to the NRA, branding them "responsible for all the mass killings that are taking place" in the United States.

33.     Defendants are intent on targeting the NRA for its advocacy, chilling the NRA's and its members' rights of free speech and association under the First Amendment, all with an eye to silence the NRA from the debate on Second Amendment rights.

34.     Moreover, the Resolution, both on its face, and as applied or threatened to be applied, violates the NRA's and its members' freedom of association by forcing them to publicly disclose affiliations that are disfavored by some, and which have no relation whatsoever to the ability of a vendor or contractor to perform requested services or provide requested goods under a government contract.

35.     The Resolution specifies the NRA's public advocacy as an obstacle to gun control, and aims to diminish the NRA's "organizational strength" in order to stifle that advocacy.

---

[18] *See* Jonathan Turley, *The NRA as a terrorist organization? San Francisco took one step too far,* THE HILL (Sept. 5, 2019, 12:30 PM)*,* https://thehill.com/opinion/civil-rights/460090-the-nra-as-a-terrorist-organization-san-francisco-took-one-step-too-far

36.     The Resolution has nothing to do with awarding government contracts to the best candidates, fiduciary stewardship of public resources, or providing equal and open opportunities. Instead, it is designed to target and discriminate against a lawful organization and its members and supporters because the government does not approve of their views or speech.

37.     While it might be an acceptable exercise of the government's power to condemn the NRA, or even lob undignified invective at millions of law-abiding gun owners, the government cannot apply its powers in a targeted, adverse manner against those with whom it disagrees—and the government certainly cannot do so in order to stifle or punish disfavored speech. Such conduct unambiguously violates the First Amendment, especially where, as here, it is not tied to any compelling, significant or legitimate government interest.

38.     The Resolution intentionally violates the First Amendment speech and association rights of the NRA and its members. Defendants' conduct would chill a person of ordinary firmness from continuing to speak against gun control, or from associating expressively or commercially with the NRA; these ongoing constitutional violations constitute irreparable injuries.

39.     Defendants' actions further attempt to improperly compel speech of the NRA's members and supporters by requiring them to disclose relationships with the NRA so that the government can coerce them to cease their relationships with the NRA or lose all government contracts.

**V.**

**CLAIMS**

**A.     Count One: Violation Of The NRA's First And Fourteenth Amendment Rights Under 42 U.S.C. § 1983 By The Establishment Of An Implicit Censorship Regime (As To All Defendants).**

40.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

41.     The First Amendment, which applies to Defendants by operation of the Fourteenth Amendment, secures the NRA's right to free speech, including its right to express its viewpoints and political beliefs regarding the constitutionally protected right to keep and bear arms.

42.     The NRA has a longstanding history of political advocacy advancing the Second Amendment rights of all Americans. Although Stefani and the other Defendants disagree with and oppose the NRA's political views, the NRA's freedom to express its views with respect to the gun-control debate is a fundamental right protected by the First Amendment.

43.     Defendants have authority over government contracts in the City and County of San Francisco.

44.     Defendants' actions—including but not limited to the passage of the Resolution—established a "system of informal censorship" designed to suppress the NRA's speech.[19]

45.     Defendants' actions were for the purpose of suppressing the NRA's pro-Second Amendment viewpoint. Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech.

46.     Defendants' unlawful exhortations to government contractors to disclose their memberships and other relationships with the NRA, and to cease those relationships with the NRA constitute a concerted effort to deprive the NRA and its members and supporters of their freedom of speech and association by threatening the loss of government contracts, and the concomitant impact on the NRA's survival and its ability to disseminate its message. Far from protected government speech, Defendants' actions constitute a "threat[] to employ coercive state power"

---

[19] *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71 (1963).

against NRA members and entities doing business with the NRA, and they are reasonably interpreted as such.[20]

47.     Defendants, through social media, interviews, on the record comments and elsewhere, have disparaged the NRA, its members and supporters, and have expressed their antipathy for the NRA, its members and supporters for the sole reason that they disagree with the NRA's strong Second Amendment advocacy.

48.     Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

49.     Defendants' intentional actions have resulted and will result in significant damages to the NRA and its members and supporters, including but not limited to deprivation of constitutional rights, reputational harm, and loss of revenues.

50.     The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

51.     In addition to the above-described damages, absent an injunction against Defendants, the NRA, its members and supporters will suffer irrecoverable loss and irreparable harm if the members and supporters are unable to obtain government contracts because of their constitutionally-protected rights, or if the NRA is deprived of vendor, contractor, member or donor relationships when persons intimidated by the Resolution sever their NRA ties. Accordingly, the NRA seeks an order preliminarily and permanently enjoining Defendants—including their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction— from any enforcement of, or from taking any official action pursuant to, the Resolution.

---

[20] *Okwedy v. Molinari*, 333 F.3d 339, 342 (2d Cir. 2003).

**B.**     **Count Two: Violation Of The NRA's First And Fourteenth**
         **Amendment Rights Under 42 U.S.C. § 1983 By**
         <u>**Retaliating Against The NRA Based On Its Speech (As To All Defendants).**</u>

52.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

53.     The First Amendment, which applies to Defendants by operation of the Fourteenth Amendment, secures the NRA's and its members and supporters' right to free speech, including the right to express viewpoints and political beliefs regarding the constitutionally protected right to keep and bear arms.

54.     The NRA has a longstanding history of political advocacy advancing the Second Amendment rights of all Americans. Although Stefani and the other Defendants disagree with and oppose the NRA's political views, the NRA's freedom to express its views with respect to the gun-control debate is a fundamental right protected by the First Amendment.

55.     The NRA's members and supporters include individuals and businesses that presently have or may seek to obtain contracts with the City and County of San Francisco to provide goods or services. Under the Resolution, these members and supporters are required to disclose any membership or other relationship with the NRA and are compelled to choose between maintaining their relationships with the NRA and keeping or obtaining government contracts.

56.     On its face, and as applied or threatened to be applied, the Resolution makes clear that one of its intentions is to remove the NRA from the public debate over gun control efforts by reducing the NRA's funding and ability to advocate for Second Amendment rights.

57.     Defendants, through social media, interviews, on the record comments and elsewhere, have disparaged the NRA, its members and supporters, and have expressed their antipathy for the NRA, its members and supporters for the sole reason that they disagree with the NRA's strong Second Amendment advocacy.

58.     The Resolution is an unconstitutional abridgement on its face, and as applied or threatened to be applied, of the NRA's and its members and supporters' affirmative rights to freedom of speech under the First Amendment.

59.     The Resolution, on its face, and as applied or threatened to be applied, imposes an unconstitutional litmus test for government contractors and vendors requiring that they disclose information about their political beliefs and speech.

60.     The Resolution, on its face, and as applied or threatened to be applied, is a content-based and viewpoint-based restriction on speech.

61.     Defendants' actions—including but not limited to the passage of the Resolution—were in response to and substantially caused by the NRA's political speech regarding the right to keep and bear arms. Defendants' actions were for the purpose of suppressing the NRA's pro-Second Amendment viewpoint. Defendants undertook such unlawful conduct with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech.

62.     Defendants had discretion in deciding whether and how to carry out their actions, including but not limited to the types of disclosures mandated from contractors and vendors, whether to introduce, pass and sign the Resolution, and the denial of government contracts based on relationships with the NRA. Defendants exercised this discretion to harm the NRA because of the NRA's speech regarding the Second Amendment.

63.     Defendants' unlawful and intentional actions are not justified by a substantial, compelling or legitimate government interest and are not narrowly tailored to serve any such interest.

64.     The designation of an advocacy group as a "terrorist organization," coupled with a unanimous legislative vow to blacklist any and all supporters of the group who may seek

government contracts, would certainly "chill a person of ordinary firmness" from continuing to engage in the targeted advocacy. The Resolution constitutes a true threat of retaliation against the NRA, and against its contractors and vendors, solely for the exercise of protected First Amendment rights of speech and association.

65.     By requiring contractors and vendors to disclose membership in or other relationships with the NRA as a precondition to being awarded a government contract, the Resolution would "chill a person of ordinary firmness" from continuing to maintain a relationship with the NRA through sponsorships or partnerships, including paid membership in the NRA.

66.     Defendants' intentional actions have resulted and will result in significant damages to the NRA and its members and supporters, including but not limited to deprivation of constitutional rights, reputational harm, and loss of revenues.

67.     The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

68.     In addition to the above-described damages, absent an injunction against Defendants, the NRA, its members and supporters will suffer irrecoverable loss and irreparable harm if the members and supporters are unable to obtain government contracts because of their constitutionally-protected rights, and the NRA is unable to continue its First Amendment rights to advocate for Second Amendment freedoms due to Defendants' actions. Accordingly, the NRA seeks an order preliminarily and permanently enjoining Defendants—including their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction— from any enforcement of, or from taking any official action pursuant to, the Resolution.

**C.     Count Three: Violation Of The NRA's Right To Freedom Of Association Protected By The First And Fourteenth <u>Amendment Under 42 U.S.C. § 1983 (As To All Defendants).</u>**

69.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

70.     The First Amendment, which applies to Defendants by operation of the Fourteenth Amendment, protects every citizen's right to engage in expressive association for the advancement of beliefs and ideas.

71.     The NRA and its members and supporters associate for the purpose of engaging in political advocacy advancing the Second Amendment rights of all Americans. In order to meet the NRA's first "Purpose[] and Objective[]" contained in its bylaws—"[t]o protect and defend the Constitution of the United States"—the NRA and its members engage in letter-writing campaigns, peaceable public gatherings, and other grassroots "lobbying" activities.

72.     Defendants' actions—including but not limited to the passage of the Resolution—are, in effect, limiting the NRA's and its members and supporters' ability to engage in political advocacy and potentially in the NRA's ability to continue to operate as an ongoing entity.

73.     Defendants' actions were taken to specifically target the NRA's and its members and supporters' right to associate and express their political beliefs in order to banish pro-Second Amendment views from public discourse.

74.     The NRA's interest in associating to advance its political beliefs, along with the beliefs of its members and supporters, significantly outweighs the government's interest in any restriction of that association.

75.     The NRA's members and supporters include individuals and businesses that presently have or may seek to obtain contracts with the City and County of San Francisco to provide goods or services. Under the Resolution, these members and supporters are required to

disclose any membership or other relationship with the NRA and are compelled to choose between maintaining their relationships with the NRA or obtaining government contracts.

76.     On its face, and as applied or threatened to be applied, the Resolution makes clear that one of its intentions is to remove the NRA from the public debate over gun-control policy by reducing the NRA's funding and ability to advocate for Second Amendment rights.

77.     Defendants, through social media, interviews, on the record comments and elsewhere, have disparaged the NRA, its members and supporters, and have expressed their antipathy for the NRA, its members and supporters for the sole reason that they disagree with the NRA's strong Second Amendment advocacy.

78.     The Resolution is an unconstitutional abridgement on its face, and as applied or threatened to be applied, of the NRA's and its members and supporters' affirmative rights to freedom of association under the First Amendment.

79.     Defendants' unlawful and intentional actions do not serve a compelling, significant or legitimate government interest and can be achieved through means significantly less restrictive of associational freedoms.

80.     Defendants' intentional actions have resulted and will result in significant damages to the NRA and its members and supporters, including but not limited to deprivation of constitutional rights, reputational harm, and loss of revenues.

81.     The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

82.     The NRA does not have an adequate remedy at law for the harm and damage caused by Defendants' violations of its and its members' constitutional rights of freedom of association. Absent an injunction against Defendants, the NRA and its members will suffer continued

deprivation of constitutional rights and irreparable harm if they are unable to secure government contracts.

83.     Accordingly, the NRA seeks an order permanently enjoining Defendants— including their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction— from any enforcement of, or from taking any official action pursuant to, the Resolution.

**VI.**

**<u>DEMAND FOR JURY TRIAL</u>**

84.     The NRA hereby demands a trial by jury on all issues so triable.

**VII.**

**<u>REQUEST FOR RELIEF</u>**

WHEREFORE the NRA respectfully requests that the Court enter judgment in the NRA's favor and against Defendants, as follows:

a.      Declaring, pursuant to 28 U.S.C. § 2201, that Defendants have violated the NRA's First Amendment rights to free speech and freedom of association under the United States Constitution;

b.      Pursuant to 28 U.S.C. § 1651 (a), 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants (in their official capacities), as follows:

(1)     to immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with the NRA's exercise of the rights afforded to it under the First Amendment of the United States Constitution;

(2)     to immediately cease and refrain from engaging in any conduct or activity which has the purpose or effect of interfering with, terminating, or

diminishing any of the NRA's memberships, sponsorships, contracts and/or business relationships with any persons, business or organizations; and

      (3)    to immediately cease and refrain from any enforcement of, or from taking any official action pursuant to, the Resolution;

c.    Granting such other injunctive relief to which the NRA is entitled;

d.    Awarding the NRA actual damages, including compensatory and consequential damages, in an amount to be determined at trial;

e.    Awarding the NRA exemplary or punitive damages;

f.    Awarding the NRA pre-judgment and post-judgment interest at the highest lawful rates;

g.    Awarding the NRA such costs and disbursements as are incurred in prosecuting this action, including reasonable attorneys' and experts' fees; and

h.    Granting the NRA such other and further relief as this Court deems just and proper.

Dated:  September 9, 2019

**GARMAN TURNER GORDON, LLP**

By:    */s/ William M. Noall*

William M. Noall
Gregory E. Garman (*pro hac vice* admission to be filed)
Erika Pike Turner (*pro hac vice* admission to be filed)
Dylan T. Ciciliano (*pro hac vice* admission to be filed)
Counsel for Plaintiff

Of Counsel:

William A. Brewer III (*pro hac vice* admission to be filed)
wab@brewerattorneys.com
Sarah B. Rogers (*pro hac vice* admission to be filed)
sbr@brewerattorneys.com
BREWER, ATTORNEYS & COUNSELORS
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 489-1400
Facsimile: (212) 751-2849