1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  WAYNE SNODGRASS, State Bar #148137
   TARA M. STEELEY, State Bar #231775
3  AILEEN M. McGRATH, State Bar # 280846
   Deputy City Attorneys
4  City Hall, Room 234
   1 Dr. Carlton B. Goodlett Place
5  San Francisco, California 94102-4682
   Telephone:    (415) 554-4655 [Steeley]
6  Telephone:    (415) 554-4691 [McGrath]
   Facsimile:    (415) 554-4699
7  E-Mail:       tara.steeley@sfcityatty.org
   E-Mail:       aileen.mcgrath@sfcityatty.org
8
   Attorneys for Defendants
9  CITY AND COUNTY OF SAN FRANCISCO, VALLIE BROWN,
   SANDRA LEE FEWER, MATT HANEY, RAFAEL MANDELMAN,
10 GORDON MAR, AARON PESKIN, HILLARY RONEN,
   AHSHA SAFAI, CATHERINE STEFANI, SHAMANN WALTON, and
11 NORMAN YEE, all individually and in their official capacities

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14 NATIONAL RIFLE ASSOCIATION OF          Case No. 3:19-cv-05669 RS
   AMERICA,
15                                        **DEFENDANTS' NOTICE OF MOTION AND**
              Plaintiff,                  **MOTION TO DISMISS COMPLAINT UNDER**
16                                        **FEDERAL RULES OF CIVIL PROCEDURE**
         vs.                              **12(B)(1) AND 12(B)(6); MEMORANDUM OF**
17                                        **POINTS AND AUTHORITIES**
   CITY AND COUNTY OF SAN
18 FRANCISCO; VALLIE BROWN, both
   individually and in her official capacity; Hearing Date:    November 21, 2019
19 SANDRA LEE FEWER, both individually  Time:            1:30 p.m.
   and in her official capacity; MATT HANEY, Place:           Courtroom 3, 17th Floor
20 both individually and in his official capacity;
   RAFAEL MANDELMAN, both individually Action Filed:    September 9, 2019
21 and in his official capacity; GORDON   Trial Date:      None set.
   MAR, both individually and in his official
22 capacity; AARON PESKIN, both           Attached documents:
   individually and in his official capacity;  • Memorandum of Points and Authorities
23 HILLARY RONEN, both individually and   • Request for Judicial Notice
   in her official capacity; AHSHA SAFAI,  • Proposed Order
24 both individually and in his official capacity;
   CATHERINE STEFANI, both individually
25 and in her official capacity; SHAMANN
   WALTON, both individually and in his
26 official capacity; and NORMAN YEE, both
   individually and in his official capacity,,
27
              Defendants.
28

1

## **TABLE OF CONTENTS**

2   TABLE OF AUTHORITIES .................................................................................................. ii

3   NOTICE OF MOTION AND MOTION TO DISMISS ..................................................1

    MEMORANDUM OF POINTS AND AUTHORITIES ...................................................1

4   STATEMENT OF ISSUES TO BE DECIDED ...............................................................1

5   INTRODUCTION .................................................................................................................1

6   STATEMENT OF FACTS ...................................................................................................2

7       I.      Resolution No. 382-19 ...............................................................................2

8       II.     The NRA's Complaint .................................................................................4

        III.    Memorandum to All City Department Heads ..........................................5

9   ARGUMENT ........................................................................................................................6

10      I.      Legal Standard For A Motion To Dismiss Under Rules 12(b)(1) And 12(b)(6) .....6

11      II.     The NRA Lacks Article III Standing. ........................................................7

12             A.     The Resolution Does Not Injure The NRA...............................................7

13             B.     The NRA Lacks Standing To Seek Injunctive Relief, Declaratory Relief, Or Damages. .............................................................................................9

14                  1.      The NRA Lacks Standing To Obtain Declaratory Or Injunctive Relief...............................................................................................10

15                  2.      The NRA Lacks Standing To Seek Damages. ................................13

16             C.     The NRA's Allegations Of "Chill" Do Not Confer Standing...................13

17      III.    The City Has Not Violated The NRA's Free Speech Rights...............................16

18      IV.    The City Has Not Retaliated Against The NRA. ..................................................18

19      V.     The City Has Not Violated The NRA's Freedom Of Association.........................20

20      VI.    The Members Of The Board Of Supervisors Are Entitled To Legislative Immunity.......................................................................................................21

21  CONCLUSION....................................................................................................................24

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Am. Library Ass'n v. Barr*
   956 F.2d 1178 (D.C. Cir. 1992) ................................................................................15

*Baird v. California Faculty Ass'n*
   34 Fed. App'x 303 (9th Cir. 2002) ...........................................................................11

*Balistreri v. Pac. Police Dep't*
   901 F.2d 696 (9th Cir. 1990) .....................................................................................6

*Bell Atl. Corp. v. Twombly*
   550 U.S. 544 (2007).....................................................................................................6

*Board of Regents v. Southworth*
   529 U.S. 217 (2000).................................................................................................16

*Bogan v. Scott-Harris*
   523 U.S. 44 (1998)........................................................................................22, 23, 24

*Bond v. Floyd*
   385 U.S. 116 (1966).............................................................................................19, 23

*Brodheim v. Cry*
   584 F.3d 1262 (9th Cir. 2009) ..................................................................................20

*California Pro-Life Council, Inc. v. Getman*
   328 F.3d 1088 (9th Cir. 2003) ............................................................................11, 14

*Carrico v. City & Cty. of San Francisco*
   656 F.3d 1002 (9th Cir. 2011) ..................................................................................13

*Catholic League for Religious and Civil Rights v. City and Cty. of San Francisco*
   624 F.3d 1043 (9th Cir. 2010) ....................................................................................8

*Cent. Delta Water Agency v. United States*
   306 F.3d 938 (9th Cir. 2002) .....................................................................................6

*Chappell v. Robbins*
   73 F.3d 918 (9th Cir. 1996) .....................................................................................22

*City of Los Angeles v. Lyons*
   461 U.S. 95 (1983).....................................................................................................10

*Clapper v. Amnesty Int'l USA et al.*
   568 U.S. 398 (2013)...........................................................................10, 11, 12, 14, 15

*Cmty. H., Inc. v. City of Boise, Idaho*
   623 F.3d 945 (9th Cir. 2010) ..............................................................................23, 24

DEFTS' MOT TO DISMISS; MPA
CASE NO. 3:19-cv-05669 RS
       ii
n:\govlit\li2019\200271\01399966.docx

*D.L.S. v. Utah*
    374 F.3d 971 (10th Cir. 2004) ...................................................................11

*Duenas v. Brown*
    No. C 10-5884 RS, 2011 WL 13244515 (N.D. Cal. Aug. 10, 2011).................14, 15

*Epstein v. Wash. Energy Co.*
    83 F.3d 1136 (9th Cir. 1996) .......................................................................6

*Freedom from Religion Found., Inc. v. Saccone*
    894 F. Supp. 2d 573 (M.D. Pa. 2012).....................................................23, 24

*Gini v. Las Vegas Metro. Police Dep't*
    40 F.3d 1041 (9th Cir. 1994) ................................................................19, 20

*Gravel v. United States*
    408 U.S. 606 (1972)..................................................................................24

*Johanns v. Livestock Mktg. Ass'n*
    544 U.S. 550 (2005) .................................................................................16

*Johnson v. Stuart*
     702 F.2d 193 (9th Cir. 1983) ...................................................................11

*Kaahumanu v. Cty. of Maui*
    315 F.3d 1215 (9th Cir. 2003) ..................................................................23

*Kokkonen v. Guardian Life Ins. Co. of Am.*
    511 U.S. 375 (1994)...................................................................................6

*Laird v. Tatum*
    408 U.S. 1 (1972)......................................................................................14

*Lopez v. Candaele*
    630 F.3d 775 (9th Cir. 2010) .......................................................11, 12, 14

*LSO Ltd. v. Stroh*
    205 F.3d 1146 (9th Cir. 2000) ..................................................................11

*Lujan v. Defs. of Wildlife*
    504 U.S. 555 (1992)...........................................................................6, 7, 12

*Lujan v. Nat'l Wildlife Fed.*
    497 U.S. 871 (1990).................................................................................13

*Matal v. Tan*
    137 S. Ct. 1744 (2017)..............................................................................17

*Mayfield v. United States*
    599 F.3d 964 (9th Cir. 2010) ....................................................................10

*Mulligan v. Nichols*
   835 F.3d 983 (9th Cir. 2016) ........................................................................18, 19, 20

*Nat'l Endowment for the Arts v. Finley*
   524 U.S. 569 (1998)..............................................................................................16

*National Rifle Association of America v. Cuomo*
   350 F. Supp. 3d 94 (N.D.N.Y. 2018)..........................................................17, 18, 21

*Nunez v. City of Los Angeles*
   147 F.3d 867 (9th Cir. 1998) .....................................................................19, 20, 21

*Okwedy v. Molinari*
   333 F.3d 339 (2d Cir. 2003) ...............................................................................20

*Parks Sch. of Bus. v. Symington*
   51 F.3d 1480 (9th Cir. 1995) ................................................................................6

*Patton v. Cty. of Kings*
   857 F.2d 1379 (9th Cir. 1988) .............................................................................20

*Perry v. Schwarzenegger*
   591 F.3d 1126 (9th Cir. 2009) .............................................................................20

*Pleasant Grove City v. Summum*
   555 U.S. 460 (2009)................................................................................16, 17, 21

*Raines v. Byrd*
   521 U.S. 811 (1997)..............................................................................................7

*Roberts v. United States Jaycees*
   468 U.S. 609 (1984)............................................................................................20

*Schmidt v. Contra Costa Cty.*
   693 F.3d 1122 (9th Cir. 2012) .......................................................................22, 23

*Scott v. Pasadena Unified Sch. Dist.*
   306 F.3d 646 (9th Cir. 2002) ...............................................................................10

*Sprewell v. Golden State Warriors*
   266 F.3d 979 (9th Cir. 2001) ......................................................................6, 17, 21

*Steel Co. v. Citizens for a Better Env't*
   523 U.S. 83 (1998)................................................................................................7

*Tenney v. Brandhove*
   341 U.S. 367 (1951)............................................................................................22

*United Veterans Mem'l & Patriotic Ass'n v. City of New Rochelle*
   72 F. Supp. 3d 468 (S.D.N.Y. 2014) ...................................................................17

*Virginia v. Am. Booksellers Ass'n*
  484 U.S. 383 (1988)......................................................................................................11

*Warren v. Fox Family Worldwide, Inc.*
  328 F.3d 1136 (9th Cir. 2003) .........................................................................................6

*Whitmore v. Arkansas*
  495 U.S. 149 (1990)...............................................................................................12, 13

*Yeldell v. Cooper Green Hosp., Inc.*
  956 F.2d 1056 (11th Cir. 1992) .......................................................................................22

*Zimmerman v. City of Oakland*
  255 F.3d 734 (9th Cir. 2001) ............................................................................................6

**State Cases**
*Cent. Mfg. Dist., Inc. v. Bd. of Supervisors of Los Angeles Cty.*
  176 Cal. App. 2d 850 (1960) ............................................................................................8

*Marquez v. Medical Bd. of Educ.*
  182 Cal. App. 4th 548 (2010) ...........................................................................................8

**Constitutional Provisions**
U.S. Const., art. III ............................................................................................ *passim*

U.S. Const. art. III, § 2, cl. 1 ...................................................................................7

U.S. Const., amend. I ........................................................................................... *passim*

U.S. Const., amend. II ...............................................................................5, 16, 19

U.S. Const., amend. XIV .............................................................................................4

**Federal Statutes**
42 U.S.C. § 1983 .......................................................................................1, 20, 22

50 U.S.C. §§ 1801, *et seq.* [Foreign Intelligence Surveillance Act]............................14

**San Francisco Statutes, Codes & Ordinances**
S.F. Board of Supervisors Reso. No. 382-19 ................................................. *passim*

S.F. Charter § 2.105 ..........................................................................................2

S.F. Charter § 3.103 ..........................................................................................4

**Rules**
Fed. R. Civ. Proc. 12(b)(1) ..........................................................................1, 6

Fed. R. Civ. Proc. 12(b)(6) ..........................................................................1, 6

**Other References**

45A Cal. Jur. 3d Municipalities § 346. ...........................................................................7

5 Eugene McQuillin, et al., The Law of Municipal Corporations § 15:2 (3rd ed. 2004) ........7, 8, 9

Mariel Padilla, *San Francisco Declares the N.R.A. a "Domestic Terrorist Organization,"*
   N.Y. Times, Sept. 4, 2019, https://www.nytimes.com/2019/09/04
   /us/san-francisco-nra-terrorist.html.............................................................................19

Ordinance.  Black's Law Dict. (11th ed. 2019) ..........................................................7

Resolution.  Merriam-Webster's Collegiate Dict. (11th ed. 2006)...................................8

## NOTICE OF MOTION AND MOTION TO DISMISS

TO THE COURT, THE CLERK, AND ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT at 1:30 p.m. on November 21, 2019, or as soon thereafter as may be heard, before the Hon. Richard Seeborg in Courtroom 3, 17th Floor, of the United States District Court, 450 Golden Gate Avenue, San Francisco, California, Defendants City and County of San Francisco, Vallie Brown, Sandra Lee Fewer, Matt Haney, Rafael Mandelman, Gordon Mar, Aaron Peskin, Hillary Ronen, Ahsha Safai, Catherine Stefani, Shamann Walton, and Norman Yee (collectively "Defendants") will and hereby do move to dismiss the complaint in this matter in its entirety under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that Plaintiff National Rifle Association of America lacks standing to pursue this action and, in the alternative, fails to state a claim upon which relief can be granted.

The motion shall be based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, Request for Judicial Notice and Proposed Order, the arguments of counsel at the hearing if any, and any such further matters as the Court deems appropriate.

## MEMORANDUM OF POINTS AND AUTHORITIES
## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Plaintiff National Rifle Association of America ("NRA") lacks Article III standing.

2. Whether the NRA has failed to state a claim under 42 U.S.C. § 1983 for violation of its First Amendment right to freedom of speech.

3. Whether the NRA has failed to state a claim under 42 U.S.C. § 1983 for the claim that it has been retaliated against for its speech.

4. Whether the NRA has failed to state a claim under 42 U.S.C. § 1983 for the claim that the City has interfered with its freedom of association.

## INTRODUCTION

The First Amendment allows lawmakers and other public officials to express their views on matters of public concern.  The members of the San Francisco Board of Supervisors ("Board")

exercised this right when they recently enacted a non-binding resolution declaring the NRA to be a terrorist organization and expressing the precatory view that San Francisco officials should assess the extent to which City contractors do business with the NRA.  Because these statements are contained in a non-binding resolution, they do no more than state the subjective opinions of the members of the Board; they do not change City laws or policies in any way.

Nevertheless, the NRA filed this lawsuit within days of the Board adopting this resolution, claiming that the resolution intrudes on the NRA's First Amendment rights to engage in political speech, avoid retaliation, and engage in associative activity.  In doing so, the NRA misrepresents and distorts the Board's resolution, claiming that it is binding (it is not); that it requires City contractors and potential contractors to disclose relationships with the NRA (it does not); and that it will lead to the creation of a "blacklist" of NRA-affiliated companies (it will not).  The NRA's allegations are false, and are contradicted by the resolution itself and related documents.  Indeed, the NRA has repeatedly admitted in public statements that the resolution will not result in any purported "blacklisting" and will not harm it, or its members, in any way.  But it persists in making contrary arguments here in court.

The Court should reject the NRA's misrepresentations and dismiss its Complaint in its entirety. Because the resolution is non-binding and does not harm the NRA in any way, the NRA lacks Article III standing to bring this suit.  And even if the NRA did have standing, it cannot state a viable First Amendment claim.  Furthermore, because the absence of harm or any threat to the NRA's First Amendment rights is incontrovertible, the NRA cannot cure these defects by amending its Complaint.

## STATEMENT OF FACTS

### I.    Resolution No. 382-19

Under the San Francisco Charter, the San Francisco Board of Supervisors has the ability to enact ordinances and pass resolutions.  The San Francisco Charter requires that all binding legislative acts by accomplished by ordinance.  S.F. Charter § 2.105; *see also* Defendants' Request for Judicial Notice ("RJN") Exh. A.  Thus, when the Board directs City departments, changes City laws, or develops City regulations, it must do so by ordinance.  *Id.*  By contrast, when the Board wishes to

make non-binding policy statements, it may do so by enacting a resolution.  *Id.*; *see also* pp. 7-9, *infra*. The Board frequently uses resolutions to express its views on matters of public policy or general topics of local, state, or nationwide importance.  For instance, in the last two years alone, the Board has enacted resolutions expressing its policy views on a number of topics: condemning the federal government's partial federal government shutdown and expressing solidarity with federal workers; declaring its support for holding the XXIII Winter Olympics in PyoengChang, Korea; urging a ban on new offshore drilling and fracking in federal and state waters in the Pacific Ocean; supporting the induction of José Julio Sarria into the California Hall of Fame; and expressing support for a California State Senate Bill expanding the definition of vehicle burglary.  RJN Exhs. B – F.

On September 3, 2019, the Board exercised its power to enact resolutions by unanimously adopting Resolution No. 382-19 ("the Resolution").  RJN Exh. G; *see also* Dkt. No. 1 ("Compl.") ¶ 27.  Supervisor Catherine Stefani introduced the ordinance on July 30, 2019 (Compl. ¶ 24), two days after a tragic shooting in Gilroy, California where three people – including a six-year-old boy – were murdered (RJN Exh. G).  The Resolution is titled a "Resolution declaring that the National Rifle Association is a domestic terrorist organization and urging other cities, states, and the federal government to do the same."  *Id.*  The NRA's Complaint discusses the Resolution but does not reproduce it in whole or in significant part.  Compl. ¶¶ 25-26.  A full copy of the Resolution is attached as Exhibit G to Defendants' Request for Judicial Notice.  The most relevant part of the Resolution states as follows:

> RESOLVED, That the City and County of San Francisco intends to declare the National Rifle Association a domestic terrorist organization; and, be it
>
> FURTHER RESOLVED, That the City and County of San Francisco should take every reasonable step to assess the financial and contractual relationships our vendors and contractors have with this domestic terrorist organization; and, be it
>
> FURTHER RESOLVED, That the City and County of San Francisco should take every reasonable step to limit those entities who do business with the City and County of San Francisco from doing business with this domestic terrorist organization; and be it
>
> FURTHER RESOLVED, That the City and County of San Francisco should encourage all other jurisdictions, including other cities, states, and the federal government, to adopt similar positions.

San Francisco Mayor London N. Breed elected to return the resolution unsigned, in accordance with Section 3.103 of the San Francisco Charter. RJN Exh. A. This is consistent with the Mayor's usual practice regarding resolutions that make non-binding policy statements. RJN Exh. H. The Resolution therefore became final without her signature on September 13, 2019. RJN Exhs. A, G.

## II.     The NRA's Complaint

Shortly after the Board unanimously approved the Resolution, the NRA filed the instant lawsuit. The Complaint contains three causes of action. Count One claims the City has violated the NRA's First and Fourteenth Amendment rights by adopting an "implicit censorship regime." Compl. ¶¶ 40-51. Count Two claims the Resolution violates the First and Fourteenth Amendments by retaliating against the NRA based on its speech. *Id.* ¶¶ 52-68. Count Three alleges that the Resolution interferes with the NRA's freedom of association, and thus violates the First and Fourteenth Amendments, because it will limit the NRA's and its members' ability to engage in political advocacy. *Id.* ¶¶ 69-83.

Throughout the Complaint, the NRA refers to the Resolution as creating a "blacklisting scheme" (Compl. at 4), and requiring City agencies to "make a list of the vendors and contractors to the government who have relationships with the NRA," (*id.* ¶ 26). Allegations about the existence of a "list" or the purported requirement that the NRA and/or its members must "publicly disclose affiliations that are disfavored by some" pervade the Complaint. *Id.* ¶¶ 26, 34; *see also id.* ¶ 46 (characterizing the Resolution as "exhortations to government contractors to disclose their memberships and other relationships with the NRA"); *id.* ¶ 65 ("By requiring contractors and vendors to disclose membership in or other relationships with the NRA as a precondition to being awarded a government contract, the Resolution would 'chill a person of ordinary firmness' . . . ."); *id.* ¶ 75 ("Under the Resolution, [the NRA's] members and supporters are required to disclose any membership or other relationship with the NRA and are compelled to choose between maintaining their relationships with the NRA or obtaining government contracts.") The Complaint does not – and could not – identify any portion of the Resolution that requires anyone to disclose his or her affiliation with the NRA. And by its plain terms – even putting aside the Resolution's non-binding nature – the Resolution does not require the creation of a "list" or direct current or potential City vendors or

1    contractors to disclose any relationship they might have with the NRA, its members, or supporters.

2    *See* p. 9, *infra*.

3    **III.    Memorandum to All City Department Heads**

4          In light of the NRA's mischaracterization of the Resolution in its Complaint, Mayor Breed and

5    City Attorney Dennis J. Herrera issued a memorandum to all City departments heads on September 23,

6    2019 ("the Memorandum").  RJN Exh. H.  The Memorandum reminded department heads that, under

7    the Charter, "[r]esolutions making policy statements do not impose duties on City departments, change

8    any of the City's existing laws or policies, or control City departments' exercise of discretion." *Id*.  If

9    the Board had sought to issue such a directive or change City laws or policies, it would have had to act

10   by ordinance.  *Id*.  Because it did not do so, the Resolution "did not change City law, [and] the City's

11   contracting processes and policies have not changed and will not change as a result of the Resolution."

12   *Id*.  The Memorandum – consistent with the Charter – reiterated that "[u]nless or until the Board of

13   Supervisors enacts an ordinance imposing new requirements," the City's laws and policies will not

14   change.  *Id*.  Thus, "no department will take steps to assess the relationships between City contractors

15   and the NRA, and no department will take steps to restrict any contractor from doing business with the

16   NRA or to restrict City contracting opportunities for any business that has any relationship with the

17   NRA." *Id*.

18         Shortly after the Mayor and the City Attorney issued the Memorandum, the NRA issued a

19   press release.  RJN Exh. I.  The headline of the press release was "San Francisco Backs Down: Facing

20   a Lawsuit by the NRA, Mayor Breed Declares – We Won't Blacklist NRA Contractors." *Id*.  The

21   press release stated that the NRA "declared victory in San Francisco today," and noted that the

22   Memorandum makes clear that no City department will take steps to restrict or otherwise punish

23   contractors for doing business with the NRA.  *Id*.  Indeed, the press release stated that "Mayor London

24   Breed formally disavowed key provisions of a municipal resolution that signaled the blacklisting of

25   contractors linked to the Second Amendment advocacy group." *Id*.

26

27

28

**ARGUMENT**

**I.      Legal Standard For A Motion To Dismiss Under Rules 12(b)(1) And 12(b)(6)**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges a court's subject matter jurisdiction over the asserted claims. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).  A district court accepts allegations of fact in the complaint as true and construes them favorably to the plaintiff when assessing its jurisdiction. *Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir. 2001).  But the party seeking to invoke federal jurisdiction – here, the NRA – bears the burden of establishing the district court's subject matter jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  It is appropriate to address the question of standing when deciding a motion to dismiss because "[t]he elements of standing are . . . an 'indispensable part of the plaintiff's case,' and accordingly must be supported at each stage of litigation in the same manner as any other essential element of the case." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  Dismissal may be warranted based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pac. Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  The court must accept material allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  But mere "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true. *Id.* at 555.  Likewise, "conclusory allegations of law and unwarranted inferences . . . are insufficient to defeat a motion to dismiss." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).  The Court also need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), opinion amended on denial of reh'g, 275 F.3d 1187 (9th Cir. 2001).

1

**II.      The NRA Lacks Article III Standing.**

2

3       Under Article III of the Constitution, the jurisdiction of the federal courts extends only to

4   "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  To satisfy the "irreducible" Article III

5   requirement of justiciability, a plaintiff must demonstrate standing to pursue each of its claims.  *Steel*

6   *Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998).  As the Supreme Court has repeatedly

7   stated, the "core" or "bedrock" elements of standing require that a plaintiff establish (1) a legally

8   recognized injury, (2) caused by the defendant, (3) that is capable of legal or equitable redress.  *See,*

9   *e.g., Raines v. Byrd*, 521 U.S. 811, 818-19 (1997) (noting the "bedrock requirement" of standing

10  generally and the need for "strict compliance" with the injury requirement specifically); *Lujan*, 504

11  U.S. at 560-61 (identifying the three "core component[s] of standing").

12      The NRA cannot show that it has been or will be injured by the Resolution.  The Resolution

13  has no legal effect.  The Mayor and the City Attorney have reminded City department heads that the

14  Resolution does not change any City laws, policies, or practices.  And the NRA has itself *admitted* that

15  the Resolution will not "blacklist NRA contractors."  RJN Exh. I.  The Court should dismiss all of the

16  NRA's claims with prejudice for lack of standing.

**A.      The Resolution Does Not Injure The NRA.**

17      Because the Resolution is a non-binding policy statement with no legal effect, and which does

18  not change City law or direct City departments to do anything, the Resolution does not injure the NRA

19  or anyone else.

20      The Resolution's non-binding nature is clear from the San Francisco Charter alone.  The

21  Charter provides that the Board must act by *ordinance* when enacting binding legislation.  *See* p. 2,

22  *supra*.  An "ordinance" is "[a]n authoritative law or decree," or a "municipal regulation . . . that

23  forbids or restricts an activity."  Black's Law Dictionary (11th ed. 2019) (providing definition of

24  ordinance).  That is, an ordinance "in its primary and usual sense means a local law, prescribing a rule

25  of conduct prospective in operation, applicable generally to persons and things subject to the

26  jurisdiction of a city."  45A Cal. Jur. 3d Municipalities § 346.  In general, acts that "creat[e] liability or

27  affect[] in any important or material manner the people of the municipality should be enacted by

28  ordinance."  McQuillin, The Law of Municipal Corporations § 15:2.

By contrast, "[a] resolution is usually a mere declaration," which has no binding effect, and which does no more than announce the Board's views on a particular matter. *Id.*; *see also* p. 3, *supra*. Indeed, the Board frequently issues resolutions expressing its views on matters it lacks power to legislate, such as whether the federal government should end deportations and where the International Olympic Committee should hold its events. *See* p. 3, *supra*. This approach is consistent with the longstanding understanding that a "resolution, generally speaking, is simply an expression of opinion or mind or policy concerning some particular item of business coming within the legislative body's official cognizance." McQuillin, The Law of Municipal Corporations § 15.2.

Federal and state courts have acknowledged this difference between ordinances and resolutions. For instance, the Ninth Circuit has recognized that resolutions, like this one, are "entirely non-binding and . . . ha[ve] no legal effect." *Catholic League for Religious and Civil Rights v. City and Cty. of San Francisco*, 624 F.3d 1043, 1075-76 (9th Cir. 2010) (en banc) (Graber, J., concurring in the judgment). In analyzing a Board resolution adopted under the same San Francisco Charter authority, the Court found that the resolution "confers no benefits or legal rights. It imposes no obligations or responsibilities on anyone. It alters no government process, ordinance, or plan. In short, it does not *do* anything. . . ." *Id.* at 1076. Similarly, California appellate courts have recognized that a city or county resolution is "the mere expression of the opinion of the legislative body," *Cent. Mfg. Dist., Inc. v. Bd. of Supervisors of Los Angeles Cty.,* 176 Cal. App. 2d 850, 860 (1960), or "a formal expression of opinion" expressed by "an official body or assembled group," *Marquez v. Medical Bd. of Educ.*, 182 Cal. App. 4th 548, 558 (2010) (quoting Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 1061) (internal quotation marks omitted).

The Memorandum from the City Attorney and Mayor confirms this understanding. It explains that existing contracting procedures and policies remain the same, and will not change "unless or until" the Board enacts an ordinance. RJN Exh. H. It makes clear that no entity that contracts with the City, or seeks to do so, will be asked about its relationship with the NRA or restricted from working with the City on the basis of any relationship with the NRA. *Id.* And it reiterates what the Charter already makes clear: The Resolution is a "non-binding statement[] announcing [the Board's] views on general policy matters." *Id.* The NRA admits this all to be true. Shortly after the Memorandum was

1   issued, the NRA touted that the Memorandum represented "a well-deserved win" for the NRA and

2   showed that the City had "back[ed] down" from any attempt to "blacklist[]" vendors who contract

3   with the NRA.  RJN Exh. I.

4          The NRA's contrary arguments in the Complaint ignore not only the Resolution's non-binding

5   nature, but also its text.  As described above, all of the NRA's claims center around its allegation that

6   the Resolution requires City departments to ask current or potential City vendors about their

7   relationship to the NRA, resulting in a "blacklisting scheme."  Compl. at 3; *see also* pp. 4-5, *supra*.

8   But the Resolution does no such thing.  The NRA either misunderstands – or seeks to misrepresent –

9   the Resolution's effect.  The NRA analogizes the Resolution to a Los Angeles ordinance the NRA is

10  challenging in a separate action.  Compl. at 3-4.  But, in contrast to the Resolution, the City of Los

11  Angeles enacted an Ordinance that requires a potential City contractor to disclose "all of its and its

12  Subsidiaries' contracts with or Sponsorships of the NRA."  RJN Exh. J.  The term "Sponsorships" is

13  defined as "an agreement [with] the NRA to provide a discount to the NRA or an NRA member of the

14  customary costs, fees, or service charges for goods or services provided by the Person to the NRA or

15  an NRA member."  *Id.*  Existing contractors must inform the City of Los Angeles of any subsequent

16  contracts or sponsorships involving the NRA.  *Id.*  Because the Los Angeles law is an *ordinance*, it

17  effects these mandatory changes to Los Angeles' contracting policies.  *Id.*  San Francisco's Resolution

18  is completely different because it is non-binding, and its plain language does nothing to create any

19  "blacklisting scheme."  The NRA's effort to analogize the Resolution to Los Angeles' contracting

20  ordinance is misleading and incorrect.  *See* McQuillin, The Law of Municipal Corporations § 15.2

21  ("Nor can a third person raise a resolution to the level of an ordinance by claiming that it has the force

22  and effect of ordinance.").

23      **B.    The NRA Lacks Standing To Seek Injunctive Relief, Declaratory Relief, Or Damages.**

24

25         Because the Resolution has not, does not, and will not change City laws or policies or

26  otherwise injure the NRA, the NRA lacks standing to seek an injunction, declaratory relief, or

27  damages.

28

1

### 1.    The NRA Lacks Standing To Obtain Declaratory Or Injunctive Relief.

The NRA cannot show that the Resolution will cause it harm at some future point, as it must to pursue "prospective relief" like a declaratory judgment or an injunction against the Resolution.  *See Mayfield v. United States*, 599 F.3d 964, 969 (9th Cir. 2010); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).  The Supreme Court, and the Ninth Circuit, have repeatedly emphasized what sorts of allegations are – and are not – sufficient to satisfy Article III in this context.  For instance, the Supreme Court has made clear that even when an individual has been subject to unlawful conduct in the past, he lacks standing to obtain injunctive relief "[a]bsent a sufficient likelihood that he will again be wronged in a similar way."  *Lyons*, 461 U.S. at 108, 111 (holding that plaintiff who was subject to an unlawful chokehold in the past lacked standing to obtain injunctive relief in the absence of an "allegation of further unfortunate encounters between Lyons and the police").  Similarly, the Court recently held that a threatened injury must not be merely "possible" but rather "certainly impending" to constitute injury-in-fact sufficient to pursue declaratory relief.  *Clapper v. Amnesty Int'l USA et al.*, 568 U.S. 398, 401 (2013).  Here, in light of the Resolution's non-binding nature and the Memorandum's reiteration that the Resolution did not change City practices, the NRA does not and cannot show that it is likely to suffer any future harm from the Resolution.  In fact, the NRA has already publicly told its members the Resolution will not harm them.  RJN Exh. I.

Other controlling cases further illustrate the shortcomings in the NRA's allegations.  The Ninth Circuit has confirmed that plaintiffs seeking injunctive relief must "establish the likelihood" that they will be subject to the challenged treatment in the future, notwithstanding that they may have suffered past harm.  *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 661 (9th Cir. 2002).  In doing so, the Ninth Circuit has observed that plaintiffs who can establish "neither past adverse treatment by an illegal practice nor real or immediate threat that [they] will be victimized by such a practice in the future" present "an even weaker claim of standing."  *Id.*  The NRA is precisely such a plaintiff:  It does not allege that it has suffered past harm, and its allegations that it will be subject to a "blacklist" or forced to "publicly disclose affiliations that are disfavored by some" are controverted by the Resolution itself, the Memorandum, and the NRA's own statements.  Compl. ¶¶ 30-32; RJN Exhs. H, I.

In addition, controlling case law has reiterated that claims of future harm "lack credibility when the challenged speech restriction by its terms is not applicable to the plaintiff[]," *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010), or where the challenged legislation does not "mandate or direct the [unlawful conduct] that [the plaintiffs] fear," *Clapper*, 568 U.S. at 409. Even in the First Amendment context, "a fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach." *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003) (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988)). Here, the Resolution is not merely inapplicable to the NRA's First Amendment conduct specifically – it has *no legal effect altogether. See* pp. 7-9, *supra.* By its plain terms, the Resolution falls short of mandating or directing the creation of a "blacklist," the requirement that the NRA's "members and supporters . . . disclose relationships with the NRA," and so forth. Compl. ¶¶ 38-39. And, because the Resolution does not change City law or direct City departments to take any action at all, the NRA's allegations are "necessarily conjectural" and fail to satisfy Article III. *Clapper*, 568 U.S. at 412 (holding that where a challenged law authorized, but did not mandate "the surveillance that respondents fear," plaintiffs lacked standing to pursue injunction or a declaration that the statute was unconstitutional).

Further, the Ninth Circuit has repeatedly held that plaintiffs lack standing when the enforcing authority has expressly "disavowed" future enforcement of the challenged law or otherwise disclaimed the legal interpretation the plaintiffs advance. *Lopez*, 630 F.3d at 788 (quoting *Johnson v. Stuart*, 702 F.2d 193, 195 (9th Cir. 1983)); *cf. LSO Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) (emphasizing that the government's failure to disavow its intent to enforce a challenged ordinance can support Article III standing). Disavowal of a challenged interpretation, or of the intent to enforce, will defeat Article III standing. *See, e.g., Baird v. California Faculty Ass'n*, 34 Fed. App'x 303, 304 (9th Cir. 2002) (holding that because government had "disavowed use of" challenged religious exemption, plaintiffs lacked standing to challenge it); *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004) ("We have held that assurances from prosecutors that they do not intend to bring charges are sufficient to defeat standing, even when the individual plaintiff had actually been charged or directly threatened with prosecution for the same conduct in the past.").

That standard is unequivocally met here.  Even if the Resolution ever threatened to injure the NRA – which it did not, *see* pp. 7-8, *supra* – the NRA has admitted that the Memorandum "disavowed" any future "blacklisting of contractors linked to" the organization.  RJN Exh. I; *see also* RJN Exh. K (further NRA statement proclaiming that the Mayor "officially disavowed" [the Resolution] with the Sept. 23 [Memorandum]").  The NRA itself characterizes the Memorandum as a "formal memorandum to City officials . . . declar[ing]" that City departments will not take any steps to restrict or punish contractors who do business with the NRA.  RJN Exh. I.  Since the Memorandum was issued, the NRA has been repeatedly trumpeting the Memorandum as "a clear concession and a well-deserved win," because it eliminates any threat of future harm to its members.  *Id.*  It cannot attempt to take a different position before this Court.  The Memorandum establishes that no City official or employee will take action against the NRA on the basis of the Resolution.  In these circumstances, Article III is not satisfied.  *Lopez*, 630 F.3d at 788.

And even if the Resolution did have some legal effect, the Complaint's allegations would still state a purely "conjectural or hypothetical" injury and thus be insufficient under Article III.  *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (internal quotation marks omitted)).  The portions of the Resolution referring to City contractors focus on *those contractors*, not the NRA itself.  RJN Exh. G.  For the NRA to experience any injury from these provisions – if they were indeed enforceable – there would have to be a City vendor or contractor who does business with the NRA.  (The NRA does not allege that there is such a vendor or contractor.)  Then, that hypothetical contractor would have to face a choice between remaining a City contractor and terminating its relationship with the NRA.  (Again, the NRA has no allegations along these lines.) And finally, the contractor would have to decide to terminate its relationship with the NRA.  (Still, the Complaint contains no such allegations.)  Even putting aside the Resolution's non-binding nature, the fact that any purported future injuries to the NRA would be hypothetical, remote and attenuated negates the prospect of Article III standing.  *Clapper*, 568 U.S. at 410-11 (holding that a plaintiff who points to a "chain of contingencies" that amounts to "mere speculation" cannot establish Article III standing).

2.      **The NRA Lacks Standing To Seek Damages.**

The NRA also lacks standing to seek damages.  Although the Complaint seeks a variety of damages – actual damages, compensatory damages, constitutional damages, and punitive damages, Compl. at 23 – the Complaint lacks sufficient allegations that the Resolution has injured the NRA, or anyone else.  The Complaint contains only conclusory allegations on this point:  The Complaint repeatedly makes the bare assertion that "Defendants' intentional actions have resulted and will result in significant damages to the NRA and its members and supporters, including but not limited to deprivation of constitutional rights, reputational harm, and loss of revenues."  *Id.* ¶¶ 49, 66, 80.  But the Complaint is entirely devoid of any specific assertions of how and when the Resolution has injured the NRA in any concrete way.  These bare conclusory allegations are insufficient to satisfy the NRA's burden to invoke this Court's jurisdiction.  *See, e.g., Carrico v. City & Cty. of San Francisco*, 656 F.3d 1002, 1006 (9th Cir. 2011) (allegation that challenged law "was intended to, and does, impact [plaintiffs'] operations" was "insufficient to establish standing"); *see also Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990) (holding that "general averments" and "conclusory allegations" are inadequate under Article III); *Whitmore*, 495 U.S. at 155 (holding that a plaintiff who failed to allege a "concrete" injury, "distinct and palpable . . . as opposed to merely abstract" harm, lacked standing under Article III).

C.      **The NRA's Allegations Of "Chill" Do Not Confer Standing.**

The NRA fares no better to the extent it claims that the Resolution's "expected chilling effects" give the organization standing to challenge it.  Compl. at 11.  The Complaint is replete with conclusory allegations that the Resolution will "'chill a person of ordinary firmness' from continuing to engage" in protected speech or association.  *Id.* at 4; *see also id.* ¶ 38 ("Defendants' conduct would chill a person of ordinary firmness from continuing to speak against gun control, or from associating expressively or commercially with the NRA."); *id.* ¶ 65 ("By requiring contractors and vendors to disclose membership in or other relationships with the NRA as a precondition to being awarded a government contract, the Resolution would 'chill a person of ordinary firmness from continuing to maintain a relationship with the NRA . . . .").  In other statements since the Memorandum's

1    circulation, the NRA has acknowledged that the Resolution does not give rise to the "threat of overt

2    legal compulsion" but still claims that "[f]or some, the chilling effect will remain."  RJN Exh. K.

3         These allegations are not sufficient to satisfy Article III.  Once again, the Supreme Court and

4    the Ninth Circuit have spoken on this point:  "Allegations of a subjective 'chill' are not an adequate

5    substitute for a claim of specific present objective harm or a threat of specific future harm."  *Laird v.*

6    *Tatum*, 408 U.S. 1, 13-14 (1972); *Clapper*, 568 U.S. at 1152-53; *see also Lopez*, 630 F.3d at 792

7    (finding allegations that "speech was chilled by the existence of [a] policy" insufficient to satisfy

8    Article III); *Getman*, 328 F.3d at 1095 (a plaintiff may not "challenge the constitutionality of a statute

9    on First Amendment grounds by nakedly asserting that his or her speech was chilled by the statute");

10   *Duenas v. Brown*, No. C 10-5884 RS, 2011 WL 13244515, at *4-*5 (N.D. Cal. Aug. 10, 2011)

11   (Seeborg, J.) (rejecting claims of subjective chill where plaintiff had not "demonstrated anything

12   *resembling* a credible threat of enforcement").  In the absence of genuine, credible threats of

13   enforcement – which the NRA does not and cannot identify, *see* pp. 7-9, *supra* – allegations that a

14   plaintiff subjectively feels "chilled" by a particular government statement are constitutionally

15   irrelevant.  *Lopez*, 630 F.3d at 792; *see also Laird*, 408 U.S. at 11 (allegations of chill are insufficient

16   unless the plaintiff can also point to the "exercise of governmental power" that is "regulatory,

17   proscriptive, or compulsory in nature").

18        The NRA also cannot manufacture standing by, for instance, pointing to any steps that it, or its

19   members, might have taken to "remove" themselves from "the public debate over gun control efforts."

20   Compl. ¶ 56.  Allegations of "self-censorship" do not give rise to Article III standing.  *Lopez*, 630 F.3d

21   at 792.  Likewise, the NRA cannot satisfy Article III by pointing to any other purported costs or

22   burdens that flow from their subjective fear of the Resolution's enforcement.  For instance, in *Clapper*

23   *v. Amnesty International*, the Supreme Court held that a coalition of human rights and media

24   organizations lacked standing to challenge the Foreign Intelligence Surveillance Act.  568 U.S. at 410-

25   11.  The Court found there to be no indication that the plaintiffs were subject to a concrete risk of

26   unlawful surveillance.  *Id.*  And it also rejected the plaintiffs' "alternative argument" that they feared

27   surveillance and had therefore taken "costly and burdensome measures to protect the confidentiality of

28   their communications."  *Id.* at 415.  The Court found this argument "improperly waters down the

1  fundamental requirements of Article III . . . because the harm respondents seek to avoid is not

2  certainly impending." *Id.* at 416.  The plaintiffs could not compensate for the lack of concrete

3  imminent harm and "manufacture standing merely by inflicting harm on themselves based on their

4  fears of hypothetical future harm that is not certainly impending." *Id.*  So too in this case, the NRA

5  cannot overcome the non-binding nature of the Resolution – and the concomitant lack of any risk of

6  future enforcement – by pointing to self-censorship or other self-inflicted harms.

7          Similarly, the NRA cannot satisfy Article III by pointing to a chill that might flow from some

8  hypothetical misunderstanding of the Resolution's effects.  In recent statements, the NRA suggests

9  that "the public" may still experience a "chilling effect," notwithstanding the absence of any "threat of

10  overt legal compulsion."  RJN Exh. K.  But "[w]hether plaintiffs have standing depends on how likely

11  it is that the government will attempt to use these provisions against them . . . and not on how much

12  the prospect of enforcement worries them" personally.  *Am. Library Ass'n v. Barr*, 956 F.2d 1178,

13  1193 (D.C. Cir. 1992).  Indeed, this Court recently found that a plaintiff in a First Amendment action

14  lacked standing to assert injuries flowing from others' subjective misunderstanding of a statute.

15  *Duenas*, 2011 WL 13244515, at *5.  In that case, the plaintiff alleged that he was injured by an

16  attorney's refusal to work with him – a refusal based on that attorney's understanding of the law the

17  plaintiff wished to challenge.  *Id.* at *1, *5.  But even though this understanding "may burden [the

18  plaintiff's] First Amendment rights, he nonetheless cannot demonstrate standing by relying on an

19  attorney's subjective, and overbroad statutory interpretation."  *Id.* at *5.  This was because "if [the

20  plaintiff] was harmed by [the lawyer's] refusal, it would appear more likely to be caused by that

21  attorney's own interpretation of the statute, than from the defendants' enforcement of [the challenged

22  statute]."  *Id.*  The same is true here.  Even if some members of the public might misunderstand that

23  the Resolution lacks any directive effect, and that misunderstanding might harm the NRA, that injury

24  does not give the NRA standing to challenge the Resolution.  This is particularly true given that any

25  public misunderstanding would likely flow from the NRA's own misrepresentations of the Resolution.

26  RJN Exh. I; *see also*, *e.g.*, Compl. at 3-4.

27          The Resolution lacks any legal effect, and thus does not and cannot injure the NRA.  The NRA

28  cannot overcome this Article III defect by repackaging its injuries under the guise of a "chill."  And

because the Resolution lacks legal effect, the NRA cannot possibly amend its Complaint to say

otherwise.  Thus, the Court should dismiss the Complaint in its entirety with prejudice, and without

leave to amend.

### III.    The City Has Not Violated The NRA's Free Speech Rights.

Even if the NRA had standing (which it does not), the NRA's First Cause of Action fails

because the Resolution does not restrict the NRA's speech.  As explained more fully above, the City

has not imposed any restrictions on the NRA's ability to speak or used any coercive power to burden

the NRA's speech.  *See* pp. 7-9, *supra*.  Instead, the Board of Supervisors engaged in permissible

government speech.

The NRA's First Cause of Action appears to be based on its allegation that members of the

Board "disparaged the NRA, its members and supporters, and have expressed their antipathy for the

NRA, its members and supporters for the sole reason that they disagree with the NRA's strong Second

Amendment advocacy."  Compl. ¶ 47.  But even assuming the accuracy of that allegation, it does not

state a cause of action.  Members of the Board – like other participants in the marketplace of ideas –

are free to disagree with the NRA's message and express "antipathy" for the NRA's views if they wish

to do so.  "The Free Speech Clause restricts government regulation of private speech; it does not

regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009).  A

government entity "is entitled to say what it wishes and to select the views that it wants to express."

*Id.* at 467-68 (internal citation omitted); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005)

("[T]he Government's own speech . . .  is exempt from First Amendment scrutiny.").  Indeed, it "is the

very business of government to favor and disfavor points of view . . . ." *Nat'l Endowment for the Arts*

*v. Finley*, 524 U.S. 569, 598 (1998) (J. Scalia, concurring).  "It is inevitable that government will adopt

and pursue programs and policies within its constitutional powers but which nevertheless are contrary

to the profound beliefs and sincere convictions of some of its citizens."  *Board of Regents v.*

*Southworth*, 529 U.S. 217, 229 (2000).  The remedy for citizens who disagree with government speech

is through the electoral process.  *See United Veterans Mem'l & Patriotic Ass'n v. City of New*

Rochelle, 72 F. Supp. 3d 468, 473 (S.D.N.Y. 2014) (citing Summum, 555 U.S. at 468-69).[1]   The Board did not violate the NRA's rights by criticizing the NRA.

The NRA fares no better with its claim that its rights have been violated by the Resolution's allegedly "unlawful exhortations to government contractors to disclose their membership and other relationships with the NRA, and to cease those relationships with the NRA."  Compl. ¶ 46.  As explained above, the Resolution does not demand or even request that City contractors disclose their membership or relationship with the NRA.  See pp. 7-9, supra. The City has not created a "blacklist" or done anything at all to "deny business to . . . vendors and contractors unless they cease their relationships with the NRA."  Compl. at 3, ¶ 26.   Likewise, the City has done nothing to cause its contractors to stop doing business with the NRA.  RJN Exhs. G, H.   The NRA's Complaint simply misrepresents the text and legal effect of the Resolution, but those misrepresentations need not be credited when resolving this motion.  Sprewell, 266 F.3d at 988.

The NRA's reliance on National Rifle Association of America v. Cuomo, 350 F. Supp. 3d 94 (N.D.N.Y. 2018), is misplaced.  In Cuomo, the NRA alleged that New York state officials violated the NRA's rights by investigating the NRA's Carry Guard insurance program, communicating "backchannel threats to banks and insurers with ties to the NRA that they would face regulatory action if they failed to terminate their relationships with the NRA," issuing a press release that urged "all insurance companies and banks doing business in New York to join the companies that have already discontinued their arrangements with the NRA . . .", issuing "guidance letters" from the Department of Financial Services ("DFS") that encouraged insurance companies and financial institutions to reconsider their relationships with the NRA, and posting a "tweet" from Governor Cuomo that stated "the NRA is an extremist organization.  I urge companies in New York State to revisit any ties they have to the NRA and consider their reputations, and responsibility to the public."  Id. at 105-111 (internal quotation marks omitted).  When considering the NRA's First Amendment challenge to these

---

[1] In Matal v. Tan, 137 S. Ct. 1744 (2017), the Court noted that, "[i]f private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints.  For this reason, we must exercise great caution before extending our government-speech precedents."  Id. at 1758.  This case does not present any issues concerning passing off private speech as government speech, and therefore Matal's warning is inapplicable.

1    actions, the district court stated that the guidance letters and Cuomo press release, when viewed alone,

2    "clearly fit into the government-speech doctrine as they address matters of public importance on which

3    New York State has a significant interest." *Id.* at 112.   The court went on to find that the NRA had

4    stated a claim, however, because the complaint alleged facts suggesting that New York officials sent a

5    "message that insurers and financial institutions that do not sever ties with the NRA will be subject to

6    retaliatory action by the state." *Id.* at 116.   Specifically, the court noted that DFS' statements may be

7    perceived as threatening because they had "regulatory authority" over the banks and insurance

8    companies targeted by the statements at issue, Governor Cuomo also "has the power to effectuate

9    regulatory action against entities doing business with the NRA," DFS actually exercised regulatory

10   authority over two insurance companies based on their actions for the NRA's Carry Guard insurance

11   program, and DFS allegedly "communicated to banks and insurers . . . that they would face regulatory

12   action if they failed to terminate their relationships with the NRA." *Id.* at 115-16.

13          No similar facts are present here.   The City has not taken any action or threatened to take any

14   action against the NRA, NRA members, or any City contractors with financial or contractual

15   relationships with the NRA.   *See* pp. 7-9, 12, *supra*.   The NRA alleges that it may suffer harm "*if* [its]

16   members and supporters are unable to obtain government contracts" because of their support for the

17   NRA, but the NRA has not alleged any facts to suggest that is likely to occur.   Compl. ¶ 51 (emphasis

18   added).   The NRA even concedes that it has no reason to fear that the City will take steps to restrict or

19   otherwise punish contractors for doing business with the NRA.   RJN Exhs. I, K.   Therefore, this case

20   is easily distinguishable from *Cuomo*.   Under the facts presented in this case, the Resolution "clearly

21   fit[s] into the government-speech doctrine," and does not violate the NRA's rights.   *Cuomo*, 350 F.

22   Supp. 3d at 112.

23   **IV.    The City Has Not Retaliated Against The NRA.**

24          The NRA's retaliation claim also fails because it is built on the faulty premise that the First

25   Amendment restricts the City and its officials from criticizing the NRA.   "Retaliation claims involving

26   government speech warrant a cautious approach by courts." *Mulligan v. Nichols*, 835 F.3d 983, 989

27   (9th Cir. 2016).   "Restricting the ability of government decisionmakers to engage in speech risks

28   interfering with their ability to effectively perform their duties" and "ignores the competing First

1    Amendment rights of the officials themselves." *Id.*  Indeed, the marketplace of ideas preserved by the

2    First Amendment would be "undermined if public officials are prevented from responding to speech of

3    citizens with speech of their own." *Id.*; *see also Bond v. Floyd*, 385 U.S. 116, 136 (1966) ("The

4    manifest function of the First Amendment in a representative government requires that legislators be

5    given the widest latitude to express their views on issues of policy. . . .  The interest of the public in

6    hearing all sides of a public issue is hardly advanced by extending more protection to citizen-critics

7    than to legislators.")  For those reasons, the Ninth Circuit has repeatedly rejected retaliation claims

8    based on allegedly retaliatory speech, noting that "[i]t would be the height of irony, indeed, if mere

9    speech, in response to speech, could constitute a First Amendment violation." *Nunez v. City of Los*

10   *Angeles*, 147 F.3d 867, 875 (9th Cir. 1998); *see also Mulligan*, 835 F.3d at 989-91; *Gini v. Las Vegas*

11   *Metro. Police Dep't*, 40 F.3d 1041, 1045 (9th Cir. 1994).

12           For the same reasons, the NRA's retaliation claim fails.  To state a claim for First Amendment

13   retaliation, the NRA must demonstrate that it "(1) engaged in constitutionally protected activity;" (2)

14   as a result, it "was subjected to adverse action by the defendant that would chill a person of ordinary

15   firmness from continuing to engage in the protected activity;" and (3) "there was a substantial causal

16   relationship between the constitutionally protected activity and the adverse action." *Mulligan,* 835

17   F.3d at 988.

18           The NRA cannot state a claim because the NRA has not been subjected to any adverse action

19   by the City, let alone any adverse action that "would chill a person of ordinary firmness from

20   continuing to engage in" protected activity.  The NRA repeats its allegation that "Defendants . . . have

21   disparaged the NRA, its members and supporters, and have expressed their antipathy for the NRA, its

22   members and supporters for the sole reason that they disagree with the NRA's strong Second

23   Amendment advocacy."  Compl. ¶¶ 47, 57, 77.  But the NRA ignores that the City and the members of

24   the Board of Supervisors are permitted under the First Amendment to express their strong

25   disagreement and even their antipathy for the NRA.  *Mulligan*, 835 F.3d at 989–91.  And the NRA

26   admits that it remains "undeterred" in the face of what it viewed as San Francisco's "publicity stunt."[2]

27
28           [2] San Francisco Declares the N.R.A. a "Domestic Terrorist Organization," N.Y. Times, Sept. 4,
     2019, https://www.nytimes.com/2019/09/04/us/san-francisco-nra-terrorist.html.

As in *Mulligan*, the City has not made any decision or taken any action affecting the NRA's "rights, benefits, relationship, or status" with the City. *Mulligan*, 835 F.3d at 989; *Gini,* 40 F.3d at 1045. Nor can the NRA show the loss or even threatened loss of any "valuable governmental benefit or privilege." *Mulligan*, 835 F.3d at 989 (quoting *Nunez,* 147 F.3d at 875). The NRA complains about being "disparaged" by the City, but any reputational harm that the NRA suffered "is not actionable under § 1983 unless it is accompanied by 'some more tangible interests.'" *Mulligan*, 835 F.3d at 989; *Gini,* 40 F.3d at 1045 (quoting *Patton v. Cty. of Kings*, 857 F.2d 1379, 1381 (9th Cir. 1988)). The NRA has not alleged any "tangible interests" that have been harmed by the Resolution.

The Resolution also does not "intimat[e] that some form of punishment or adverse regulatory action would follow" based on the NRA's speech. *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009) (quoting *Okwedy v. Molinari*, 333 F.3d 339, 343 (2d Cir. 2003)); *Nunez*, 147 F.3d at 875 (verbal threats not sufficient to allege First Amendment retaliation claim). The Resolution does not threaten *any* punishment or adverse regulatory action against the NRA. Nor has the City taken any such action. The NRA claims that the Resolution includes a "legislative vow to blacklist any and all supporters" of the NRA, and requires "contractors and vendors to disclose membership in or other relationships with the NRA," but those allegations are simply false. Compl. ¶¶ 59, 64-65; RJN Exhs. G, H; *see also* pp. 7-9, *supra*. Indeed, as explained more fully above, the Resolution says nothing at all about requiring anyone to disclose membership in the NRA, or about creating a "blacklist." RJN Exh. G. And the NRA ignores that the Resolution is non-binding in any event. *See* pp. 7-9, *supra*. The NRA's Complaint shadow boxes against a Resolution that simply does not do what the NRA claims that it does.

## V. The City Has Not Violated The NRA's Freedom Of Association.

The First Amendment protects a "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). Government action can infringe upon that right by requiring disclosure of "the fact of membership in a group seeking anonymity . . . ." *Id.* at 622-23. "[C]ompelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Perry v. Schwarzenegger*, 591 F.3d 1126, 1139 (9th Cir. 2009).

1  Here, the NRA's Freedom of Association claim is based on its allegation that the Resolution

2 requires NRA members who "presently have or may seek to obtain contracts with the City and County

3 of San Francisco . . . to disclose any membership or other relationship with the NRA and are

4 compelled to choose between maintaining their relationships with the NRA or obtaining government

5 contracts." Compl. ¶ 75.  The NRA's claim fails, however, because the Resolution plainly does not

6 require anyone to disclose membership in or any other relationship with the NRA.  RJN Exh. G.  The

7 NRA does not identify any language in the Resolution that would require disclosure.  Nor has the

8 NRA pointed to any action taken by the City that would require anyone to disclose their membership

9 in the NRA.  Because the Resolution does not require disclosure, the Court need not treat the NRA's

10 allegation as true for purposes of this motion to dismiss.  *Sprewell*, 266 F.3d at 988.

11  The NRA has not alleged any other facts that could state a Freedom of Association claim.  The

12 NRA does not allege (and cannot allege) that the City has done anything to limit the NRA's ability to

13 meet or communicate with its members.  Nor can the NRA allege that the City has imposed any

14 penalty on NRA members that participate in NRA advocacy, or restricted in any way the NRA's

15 ability to engage in political activity.  The NRA again alleges that "Defendants . . . have disparaged

16 the NRA" and expressed "antipathy for the NRA," but criticizing the NRA does not interfere with the

17 NRA's right to association.  Compl. ¶ 77; *see also* pp. 16-17, *supra*.  While the First Amendment

18 protects the NRA's right to join together to advance a political agenda, it does not give the NRA the

19 right to silence its critics.  As explained above, the City and the members of the Board are free to

20 express their own views about the NRA.  *Summum*, 555 U.S. at 467; *see also* pp. 16-17, *supra*.

21 "[M]ere speech, in response to speech" cannot constitute a First Amendment violation.  *Nunez*, 147

22 F.3d at 875; *see also Cuomo*, 350 F. Supp. 3d at 120 (rejecting freedom of association claim based, in

23 part, on government speech declaring the NRA to be an "extremist organization.").

24  All of the NRA's claims should be dismissed.  And because further amendment would be

25 futile, *see* pp. 7-9, *supra,* the dismissal should be with prejudice.

26 **VI.     The Members Of The Board Of Supervisors Are Entitled To Legislative Immunity.**

27  Finally, the NRA's claims should be dismissed against Supervisors Brown, Fewer, Haney,

28 Mandelman, Mar, Peskin, Ronen, Safai, Stefani, Walton, and Yee.  The NRA's Complaint seeks to

1   hold members of the San Francisco Board of Supervisors liable, in their individual and official

2   capacities, for introducing and voting for the Resolution.  Compl. ¶¶ 23-27.  The NRA's claim fails

3   because members of the Board of Supervisors are entitled to absolute immunity.

4           "Local legislators are entitled to absolute immunity from § 1983 liability for their legislative

5   activities."  *Bogan v. Scott-Harris,* 523 U.S. 44, 54 (1998).  "The rationales for according absolute

6   immunity to federal, state, and regional legislators apply with equal force to local legislators.

7   Regardless of the level of government, the exercise of legislative discretion should not be inhibited by

8   judicial interference or distorted by the fear of personal liability."  *Id.* at 52.  "The immunity serves a

9   prophylactic function central to the proper functioning of a democratic government, making

10  representatives answerable to the entire electorate rather than a select few."  *Chappell v. Robbins*, 73

11  F.3d 918, 921 (9th Cir. 1996).  Indeed, "[f]or our founding fathers  . . . the growth of democracy and

12  the right of the nation's legislators to be free from civil suit went hand-in-hand.  It was well understood

13  that for a democratic government to function democratically, our elected officials, when acting in their

14  legislative capacity, must answer only to their constituents and only on election day."  *Yeldell v.

15  Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1061 (11th Cir. 1992).  Thus, if the Board members acted

16  unwisely when passing the Resolution, the check on their actions is through the "electoral process" –

17  not through resort to the courts.  *Bogan,* 523 U.S. at 53.

18          Absolute legislative immunity attaches to all actions taken "in the sphere of legitimate

19  legislative activity."  *Id.* at 54.  Officials act outside their "legitimate sphere of legislative authority"

20  when they "acquire power by an unwarranted extension of privilege."  *Schmidt v. Contra Costa Cty.*,

21  693 F.3d 1122, 1132-33 (9th Cir. 2012) (quoting *Tenney v. Brandhove,* 341 U.S. 367, 376 (1951)).

22  "Officials cross the line only when they violate the separation of powers and "usurp [] . . .  functions

23  exclusively vested in the Judiciary or the Executive."  *Id.*   In the Ninth Circuit, courts determine

24  whether an action is legislative by considering four factors: "(1) whether the act involves ad hoc

25  decisionmaking, or the formulation of policy; (2) whether the act applies to a few individuals, or to the

26  public at large; (3) whether the act is formally legislative in character; and (4) whether it bears all the

27  hallmarks of traditional legislation."  *Cmty. H., Inc. v. City of Boise, Idaho*, 623 F.3d 945, 960 (9th Cir.

28

1   2010) (quoting *Kaahumanu v. Cty. of Maui*, 315 F.3d 1215, 1220 (9th Cir. 2003)).  "The first two

2   factors are largely related, as are the last two factors, and they are not mutually exclusive."  *Id.*

3         Each of those factors is easily satisfied in this case.  The Resolution is not an "ad hoc"

4   decision, and it does not apply only to a few individuals.  An "ad hoc" decision is made "with a

5   particular end or purpose," as distinguished from "a coordinated policy."  *Cmty. H., Inc.*, 623 F.3d at

6   961.  Decisions that involve "the formation of policy" are not ad hoc decisions.  *Id.*  Here, the NRA

7   challenges a Resolution that states the unanimous public policy views of the Board of Supervisors.

8   And the Board's policy positions concern the entire City – not only a few individuals.  To be sure, the

9   Resolution's focus is on the NRA, which the Resolution calls a "domestic terrorist organization."  But

10  the Resolution does not seek to achieve any particular "end or purpose," but instead simply announces

11  the views of the City's elected officials.  That the Resolution is non-binding – or what the NRA claims

12  is merely a "sound-bite," *see* p. 19 n.2, *supra* – does not affect the immunity analysis.  Legislative

13  immunity still protects the ability of the members of the Board to make their views known to the

14  voters in San Francisco.  *Freedom from Religion Found., Inc. v. Saccone*, 894 F. Supp. 2d 573, 583

15  (M.D. Pa. 2012) (holding legislative immunity applies to resolutions that amount to "gratuitous

16  political grandstanding").  Indeed, granting immunity in this context is fully consistent with the

17  principles underlying legislative immunity: "[l]egislators have an obligation to take positions on

18  controversial political questions so that their constituents can be fully informed by them, and be better

19  able to assess their qualifications for office; also so they may be represented in governmental debates

20  by the person they have elected to represent them."  *Bond*, 385 U.S. at 136-37.

21        Likewise, the third and fourth factors are easily satisfied here.  The San Francisco Charter

22  specifically authorizes the Board to pass resolutions.  RJN Exh. A.  And the Resolution was passed at

23  a public meeting after a vote in compliance with the City's procedures.  *Id.*  "The act of voting on and

24  passing ordinances and resolutions pursuant to correct legislative procedures is formally and

25  indisputably legislative."  *Schmidt,* 693 F.3d at 1137 (internal citations and quotations omitted); *see*

26  *also Cmty. H., Inc.*, 623 F.3d at 960 (holding that the city's actions when passing resolutions "were

27  formally legislative and bore all the hallmarks of traditional legislation that implemented City

28  policy"); *Bogan*, 523 U.S. at 55 (holding that the action of voting for an ordinance is "quintessentially

legislative"); *see also Gravel v. United States*, 408 U.S. 606, 625 (1972) ("A legislative act is any action 'with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.'"). Indeed, "[i]t is pellucidly clear that resolutions, whether passed by a single house or both, whether creating legally binding obligations or not, fall squarely within the scope of absolute legislative immunity from suit." *Freedom from Religion Found.*, 894 F. Supp. 2d at 583.

The NRA complains that Board members – particularly Supervisor Stefani – acted with animus towards the NRA.  But consideration of the Board members' intent is "strictly off-limits in the legislative immunity analysis." *Cmty. H., Inc.*, 623 F.3d at 960.  The inquiry into whether the officials' actions were legislative must be "stripped of all considerations of intent and motive." *Bogan*, 523 U.S. at 55.

Accordingly, members of the Board of Supervisors are entitled to absolute immunity for their actions in connection with the passage of the Resolution.  The City respectfully requests that the Court dismiss Supervisors Brown, Fewer, Haney, Mandelman, Mar, Peskin, Ronen, Safai, Stefani, Walton, and Yee from this action.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint in its entirety, with prejudice and without granting the NRA leave to amend.

Dated:  October 17, 2019

DENNIS J. HERRERA
City Attorney
WAYNE SNODGRASS
TARA M. STEELEY
AILEEN M. MCGRATH
Deputy City Attorneys

By: /s/Tara M. Steeley

TARA M. STEELEY
Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO,
VALLIE BROWN, SANDRA LEE FEWER,
MATT HANEY, RAFAEL MANDELMAN,
GORDON MAR, AARON PESKIN, HILLARY
RONEN, AHSHA SAFAI, CATHERINE STEFANI,
SHAMANN WALTON, and NORMAN YEE, all
individually and in their official capacities